Filed 2/4/25 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064319 |
| v. | (Super. Ct. No. BAF2300102) |
| BENNY EUGENE TOWNES, | ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |
| Defendant and Appellant. | |

It is ordered that the opinion filed herein on February 3, 2025, be modified as follows:

On page 1, in the counsel listing for Defendant and Appellant, "Samson" is changed to "Sampson" so that it reads:

Michael C. Sampson for Defendant and Appellant.

There is no change in the judgment.

SANCHEZ, J.

WE CONCUR:

O'LEARY, P. J.

GOODING, J.

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G064319 |
| v. | (Super. Ct. No. BAF2300102) |
| BENNY EUGENE TOWNES, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Riverside County, Matthew C. Peratoni, Judge. Affirmed.

Michael C. Samson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Liz Sulaiman, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \*

INTRODUCTION

Defendant Benny Townes (Defendant) raped and impregnated his biological daughter Jane Doe 1 when she was 16 years old and raped, sodomized, and committed lewd or lascivious acts against his biological daughter Jane Doe 2 when she was 13 and 14 years old.  A jury found Defendant guilty as charged of three counts of forcible rape of a minor who is 14 years of age or older (Pen. Code, §§ 261, subd. (a)(2), 264, sub. (c)(2); counts 1, 2, and 7)[1]; two counts of incest (*id.*, § 285; counts 3 and 8); one count of committing lewd or lascivious act with a minor who is under the age of 14 (*id.*, § 288, subd. (a); count 4); one count of sodomy of minor who is under the age of 14 (*id.*, § 269, subd. (a)(3); count five), and one count of sodomy of minor who 14 years of age or older (*id.*, § 286, subd. (c)(2)(C); count six).

Jane Doe 1 was the victim in counts 1–3 and Jane Doe 2 was the victim in counts 4–8.  The trial court sentenced Defendant to a term of 150 years to life in prison.

Defendant admitted at trial he engaged in sexual intercourse with his daughter Jane Doe 1.  He contends, however, substantial evidence does not support a finding that he did so against Jane Doe 1's will by means of force or duress and, therefore, the convictions on counts 1 and 2 must be reversed.  He also contends that as the convictions on counts 1 and 2 must be reversed, the jury's true findings on multiple victim enhancement allegations (Pen. Code, §667.61, subd. (e)(4)) on counts 1 and 2 and 4–7 also must be reversed.

In this unusual case, we hold a threat of retribution sufficient to support a finding duress under Penal Code section 261, subdivisions (a)(2)

---

[1] All further statutory references are to the Penal Code.

and (b)(1), can be purely psychological, coming not at the hand of the defendant, but rather by God, as taught to the victim by the defendant. Here, substantial evidence shows that over years of indoctrination, Defendant instilled in Jane Doe 1 the beliefs that he was the son of God, obeying a parent was a commandment from the Bible, disobeying a commandment would get you in trouble with or anger God, and having sex with her father was permitted by the Bible.[2] The threat—direct and implied—of divine retribution if Jane Doe 1 did not have sexual intercourse with Defendant constituted duress sufficient to uphold the convictions for forcible rape.

Accordingly, we affirm the judgment.


FACTS

I.

BACKGROUND

Defendant is the father of nine children by two different mothers. Two of his daughters, Jane Doe 1 and Jane Doe 2, have the same mother (Mother). In 2013 or 2014, Defendant, his nine children, and their mothers moved from Missouri to San Jacinto, California where they lived together in the same house.

Defendant and his family were "religious." The family attended church regularly and Defendant talked about the Bible and religion every

_____

[2] Defendant's misuse of the Bible calls to mind Shakespeare's often-quoted adage, "[t]he devil can cite Scripture for his purpose." (Shakespeare, The Merchant of Venice, act I, scene iii, line 99.) Defendant misconstrued and misused both the Commandment to "Honor thy Father and thy Mother" and the story of Lot and his daughters for the purpose of coercing Jane Doe 1 into engaging in sexual intercourse with him.

3

day. Defendant taught everyone in the family about the Bible; he usually held group sessions and sometimes would randomly say things about religion or the Bible. He frequently told his children "he was the son of God," and they believed him. He taught his children that obeying their parents was "a commandment" in the Bible, it was a sin to go against anything a parent said, and they would go to hell if they violated any commandment and did not repent.

When the children misbehaved, Defendant would reprimand them and often inflicted corporal punishment using items such as a broom, belt, or cord. Defendant would threaten the children with beatings and sometimes threatened to kill them. He also threatened to rape Jane Doe 2. Defendant did not permit his daughters to go to other people's homes, talk to boys, use social media, or go outside very often. Defendant did not allow his children to have anybody come to their house. When Jane Doe 2 was in the fifth grade, Defendant pulled his children out of school for a couple of weeks because he hated the school system.

Defendant would not let his sons out of their rooms unless he sent them out or they went to school. He believed one son was attracted to Jane Doe 1 and would not let him be around her. Only the youngest son was permitted to go upstairs, where the daughters had their bedrooms. Defendant often would beat Mother at night.

## II.

### OFFENSES AGAINST JANE DOE 1 (COUNTS 1–3)

Jane Doe 1 was born in August 2002. When Jane Doe 1 was in the ninth or tenth grade Defendant engaged in sexual intercourse with her. Jane Doe 1 believed she had no choice but to engage in sexual intercourse

4

with Defendant because he had said things leading her to believe "it was a rule" from "[t]he Bible." Defendant had told Jane Doe 1 that obeying your parents is a commandment "like one of the Ten Commandments" and she believed God would be upset or she would "get in trouble by God" if she disobeyed a commandment. She believed Defendant's claim of being the son of God because he knew a lot about the Bible.

Defendant read Jane Doe 1 the story of Lot and his two daughters (Genesis 19:30-38) in which Lot's daughters engaged in sexual intercourse with Lot and became impregnated by him. He told her the story to let her know that sex between a father and a daughter happened in the Bible. Jane Doe 1 did not know having sex with her father was wrong because, "the Bible thing, that's what the Bible was saying, so I actually believed it."

Although Jane Doe 1 testified at trial she was not sure how many times Defendant had sex with her, she had told police officers that Defendant had engaged in sexual intercourse with her multiple times over a period of seven months. Defendant admitted at trial that he had engaged in sexual intercourse with Jane Doe 1 seven to ten times. He testified he did not care what age his daughters were when he had sex with them because the Bible did not specify an age of consent.

Jane Doe 1 was 16 years old when she became pregnant by Defendant in March 2019. In February 2019, just before becoming pregnant, Jane Doe 1 handed Defendant a letter she wrote to him. In the letter, Jane Doe 1 told Defendant: "I don't want to make you mad. I'm trying my hardest. [¶] . . . [¶] I am sorry for all the People I've disrespected. I don't want you to be hurt."

5

Jane Doe 1 gave birth to Defendant's child in December 2019. She did not want Defendant to get in trouble so when interviewed by police officers she told one officer she did not know who the father of her child was. But immediately thereafter, Jane Doe 1 told another police officer that Defendant was the father.

Defendant did not hurt Jane Doe 1 during intercourse and she testified "there was no force involved." Jane Doe 1 never told Defendant she did not want to have sex with him. She told police officers that having sexual intercourse with her father was not wrong and there was "nothing bad" about it because it was not prohibited by the Bible. At trial Jane Doe 1 testified she did not know whether having sexual intercourse with one's father was right or not.

Jane Doe 1's mother and sisters were in the house when Defendant had sexual intercourse with her. Jane Doe 1 told police that her mother was aware of what was going on but did not care so long as no one was being hurt.

III.

OFFENSES AGAINST JANE DOE 2 (COUNTS 4–8)

Jane Doe 2 was born in 2003. She was about 13 years old when, in August or September 2017, Defendant first inappropriately touched her. Defendant called Jane Doe 2 up to his room. While alone in the room, Defendant told Jane Doe 2 that he had noticed she was getting older and her body was changing and developing. He made Jane Doe 2 take her pants off and touched her buttocks. This made Jane Doe 2 feel very uncomfortable; it felt "wrong."

6

A couple of days later, Defendant again called Jane Doe 2 to his room, locked the door, had her take off her pants, and touched her buttocks. Jane Doe 2 did not want her father touching her in this way but she was scared to ask him to stop.

Thereafter, Defendant would call Jane Doe 2 to his room every week, have her remove her clothing, and sodomize her. This hurt Jane Doe 2 and she thought it was disgusting. On two occasions, he tried to vaginally penetrate Jane Doe 2, however, it was extremely painful for her, and she backed away from him. Defendant did not try intercourse with Jane Doe 2 again and went back to sodomizing her. This went on for several months. Although Jane Doe 2 did not like it and told Defendant it hurt, he continued anyway and told Jane Doe 2 she should let him do it "to make him happy" because her behavior and grades were not "enough to make him happy." Jane Doe 2 did not yell for help because she was scared of Defendant, the door was locked, anybody who might try to help "would just probably get beat or something," and defendant was "stronger than all of us."

Mother worked during the day and often did not come home until after everyone was asleep, so she was unaware of Defendant sodomizing Jane Doe 2. Jane Doe 2 did not feel as though she could tell anyone outside of the family because she was afraid of losing her mom and siblings, and that people would not believe her or would judge her.

In June 2018, when Jane Doe 2 was 14 years old, Mother took her and four of her other children to Missouri because she was tired of Defendant abusing her children. Jane Doe 1 decided to stay behind with Defendant, his three other children, and their mother. At some point, Mother drove back to California to try and take Doe 1 with her back to Missouri, but

7

she refused to go.  Jane Doe 1 stayed with Defendant because she "liked it at home" and "felt cared about."

## DISCUSSION

### I.

#### STANDARD OF REVIEW

When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)  We view the evidence in the light most favorable to the jury verdict and presume in support of the verdict every fact a jury could reasonably deduce from that evidence.  (*Ibid*.)  We do not reweigh the evidence or reassess witness credibility, unless it is inherently improbable, and do not reverse a jury verdict simply because the evidence can be reconciled with a contrary result.  (*People v. D'Arcy* (2010) 48 Cal.4th 257, 293.)

### II.

#### LEGAL PRINCIPLES OF FORCIBLE RAPE

Defendant was convicted of two counts (counts 1 and 2) of forcibly raping his daughter Jane Doe 1, a minor who was 14 years of age or older. The crime of rape is defined as "an act of sexual intercourse accomplished" under any of the circumstances identified in Penal Code section 261, subdivision (a).  (Pen. Code, § 261, subd. (a).)  Those circumstances include, "[i]f [sexual intercourse] is accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily

8

injury on the person or another." (Pen. Code, § 261, subd. (a)(2).) On counts 1 and 2, Defendant was sentenced according to Penal Code section 264, subdivision (c)(2), which states: "A person who commits rape in violation of paragraph (2) of subdivision (a) of Section 261 upon a minor who is 14 years of age or older shall be punished by imprisonment in the state prison for 7, 9, or 11 years."

For purposes of rape under Penal section 261, duress is defined to mean: "[A] direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted. The *total circumstances*, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress." (Pen. Code, § 261, subd. (b)(1), italics added; see *People v. Soto* (2011) 51 Cal.4th 229, 246 (*Soto*).)

## III.

### SUBSTANTIAL EVIDENCE SUPPORTS THE CONVICTIONS FOR RAPE OF JANE DOE 1

Defendant argues that the prosecution's theory for counts 1 and 2 was he committed rape by means of duress, and not by force, violence, menace, or fear, and that substantial evidence does not support a finding of duress. We disagree. Evidence of the total circumstances of the present case are sufficient to uphold a finding that Defendant used duress by directly and impliedly threatening retribution from God if Jane Doe 1 disobeyed his requests to engage in sexual intercourse with him.

9

Defendant maintained a strict and "religious" home in which he lectured daily on religion and the Bible. He limited his children's access to the outside world, often inflicted corporal punishment, and would threaten to beat his children. Defendant frequently told his children he was "the son of God." Jane Doe 1 believed Defendant was the son of God because he knew a lot about the Bible.

Defendant taught his children the Bible commanded them to obey their parents and told Jane Doe 1 that obeying your parents was a commandment "like one of the Ten Commandments." Defendant testified that he believed obeying your parents was a mandate from one of the Ten Commandments and he would remind his children of that commandment.

Jane Doe 1 testified that Defendant told her God would be "upset" if she disobeyed a commandment; she believed that if she broke a commandment she "would get in trouble by God." She did not know exactly what God would do because God "forgives," but the thought of going to hell did cross her mind. Jane Doe 2 testified that Defendant told her that because he was the son of God, "*we* would go to hell" if they disobeyed him or the word of God. (Italics added.) Defendant testified that he told his all of his children that they would go to hell if they violated any commandment and did not repent. Under the substantial evidence standard, we draw from this testimony the inference that Defendant told Jane Doe 1 she would go to hell if she disobeyed him and did not repent. (*People v. D'Arcy, supra*, 48 Cal.4th at p. 293.) But whether Jane Doe 1 was told she would be sent to hell or only that she would get in trouble with God, Defendant made clear she would face retribution from the Almighty for disobeying her father.

Before having sexual intercourse with Jane Doe 1, Defendant told her the story of Lot and his daughters from the book of Genesis to show that

10

sex between a father and a daughter happened in the Bible. Telling Jane Doe 1 about Lot and his daughters would make it seem as though sex between a father and his daughter was normal and biblically permissible. As Jane Doe 1 testified, she believed there was nothing wrong with sex between a father and a daughter because "the Bible thing, that's what the Bible was saying."

A defendant's position of authority is a factor in considering duress. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46.) Defendant was an authority figure not only by virtue of being Jane Doe 1's father, but also because he repeatedly told Jane Doe 1 and his other children that he was *the* son of God. When Defendant raped Jane Doe 1 she was a minor and 23 years younger than he was.

Jane Doe 1 testified that Defendant did not hurt her or threaten to harm her, and she was not afraid of him. Her testimony does not foreclose coercion by duress, for "[t]he very nature of duress is psychological coercion." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15; see *id.* at p. 14, disapproved on another ground in *Soto, supra*, 51 Cal.4th at p. 248, fn. 12.)[3] "A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the

---

[3] Defendant argues *Veale* and *Cochran* are inapposite because they dealt with the definition of duress used in Penal Code section 288, subdivision (b)(1). Duress as used in section 288, subdivision (b)(1) has been defined by case law to involve "a direct or implied threat of force, violence, danger, *hardship* or retribution" (*People v. Leal* (2004) 33 Cal.4th 999, 1004.) (Emphasis added) The only difference between that definition and the definition of duress in section 261(b)(1) is the latter does not include the word "hardship." We are not dealing with a claim of hardship, and nothing in the cases cited by Defendant suggests *Veale*'s and *Cochran*'s analysis of duress would not otherwise apply to duress as defined in section 261(b)(1).

11

molestation, may constitute a threat of retribution and may be sufficient to establish duress."[4] (*Ibid.*) Jane Doe 1 underwent severe and long-term psychological coercion from Defendant's indoctrination and direct and implied threats of adverse consequences at the hands of God if she disobeyed him.

Defendant argues that he never threatened to personally exact revenge on Jane Doe 1 if she would not engage in sexual intercourse with him. It does not matter whether the threatened retribution was to be carried out by the Defendant, another person, or the Almighty for there to be duress. For example, suggesting to a child that reporting molestation or refusal to acquiesce to it may lead to a family breakup—an event carried out by people other than the molester—may constitute a threat of retribution sufficient to establish duress. (*Cochran, supra*, 103 Cal.App.4th at p. 15.) What creates duress is the threat that adverse consequences will be inflicted by some source if the target of the threat does not acquiesce.

Defendant argues that the standard for duress is objective, and under an objective standard no reasonable person of ordinary susceptibility would have sex with that person's father simply because the father had taught the victim that one of God's commandments was to obey one's parents. Although "the legal definition of duress is objective in nature" (*Soto, supra*, 51 Cal.4th at p. 246), in assessing the presence of duress under Penal Code

---

[4] In *People v. Hecker* (1990) 219 Cal.App.3d 1238 1250-1251, disapproved on another ground in *Soto, supra*, 51 Cal.4th at p. 248, fn. 12, the court concluded that "'[p]sychological coercion' without more does not establish duress.'" The court in *Cochran* believed this language from *Hecker* to be overbroad. (*Cochran, supra*, 103 Cal.App.4th at p. 15.) We agree with *Cochran* that duress is by nature a form of psychological coercion. (See *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 ["duress involves psychological coercion"].)

section 261(b)(1) we must consider "[t]he total circumstances" (see *Soto, supra*, at p. 246, fn. 9). A reasonable 15 or 16-year-old girl of ordinary susceptibility who had been brought up in a strict and religious home such as Defendant's, had limited access to the outside world, whose biological father used corporal punishment, was taught and trained by her biological father (who said he was the son of God) to believe that obeying him was a biblical commandment, was told by her father that violating a commandment would make God angry and possibly lead to hell, and was taught that sex between a father and his daughter happened in the Bible, could be coerced by her father into acquiescing to engaging in sexual intercourse with him.

Defendant relies on *People v. Espinoza* (2002) 95 Cal.App.4th 1287 to argue that "a finding of duress [cannot] be supported by the facts that the defendant was the victim's biological father, they lived in the same house, he was much larger and older than the victim, he had molested her numerous times in the past, the victim was in special education, and she was subjectively afraid of the defendant." The court in *Espinoza* concluded that "[d]uress cannot be established unless there is evidence that 'the victim['s] participation was impelled, at least partly, by an implied threat" and "[n]o evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind." (*Id.* at p. 1321.)

Whether we agree or disagree with the holding of *Espinoza* is not determinative. The facts here are readily distinguishable. In the present case Jane Doe 1 was subject to psychological coercion, and there was evidence of express and implied threats made by Defendant and those threats at least partly impelled Jane Doe 1 to have sex with him.

13

## DISPOSITION

The judgment is affirmed.


                              SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


GOODING, J.